1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

FEDERATED RURAL ELECTRIC           )
INSURANCE EXCHANGE and TIG         )
INSURANCE COMPANY,                 )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           )  No. CV04-5052RBL
                                   )
PUBLIC UTILITY DISTRICT NO. 1 of   )  **Certified Copy**
COWLITZ COUNTY, WASHINGTON, a      )
Washington municipal corporation,  )
                                   )
          Defendant.               )

VIDEOTAPED DEPOSITION OF GARY ALLAN HUHTA

Taken in behalf of the Plaintiffs

June 22, 2005

MOORE HENDERSON ALLEN & THOMAS
Professional Court Reporting & Videography

621 SW Morrison, Suite 425 • Portland, OR 97205    503.226.3313 • 1.800.962.7308 • Fax 503.273.0109

CV04-5052RBL
Houser Dec., Exh. A-3

56

| 10:10:25 | 1 | title? |

A.   Yes.

Q.   Okay.  Were they maintained -- or retained, I should say?

A.   Yes.

Q.   In other words, the District still has the stream flow records from which these calculations were derived?

A.   Yes.  And your question earlier seemed to imply that maybe these numbers were a comparison to a prior year or something of that nature, but they -- these numbers are actually produced by utilizing the then-current stream flows.

Q.   Yeah.  Thank you.  I understand that now.

Does the District -- does the District have a written agreement with Lloyd's of London about the -- who receives any portion of the counterclaim damages if they are awarded in this case?

A.   I'm aware that the District has signed an agreement or agreements with Lloyd's of London.  I'm not aware of the content.

Q.   You're not aware of the terms?

A.   No.

**CV04-5052RBL**
**Houser Dec., Exh. A-4**

MR. CLARK:  Counsel, in the responses to the interrogatories and requests for admissions there's a term

| 10:11:53 | 1 | used, "joint litigation agreement." |

We were talking yesterday about the other agreement that you indicated is -- was not in effect following the removal of BPA -- or removal of PacifiCorp as a party to this case.

Is it your position that the joint litigation agreement between PacifiCorp and the District -- sorry -- between Lloyd's and the District is not discoverable?

MR. VICTORY:   I'm looking for the exhibit that we marked yesterday.

MR. CLARK:   Yeah.

I think it's Exhibit 27, Counsel.

MR. VICTORY:   What I indicated yesterday was what is termed as "agreement signed and dated 18 July of 2003" is no longer in force.

Now, I don't know what you're referring to as a "joint litigation agreement."

MR. CLARK:   The -- Mr. --

MR. VICTORY:   Also, Exhibit 26 we marked yesterday, and that exhibit refers to -- it's an April 30th, 2003, letter from Cable Houston, and that refers to "joint prosecution and recovery agreement," and I indicated that is no longer in effect either.

So I don't know what you're referring to as a "joint litigation agreement."

58

| | |
|---|---|
| 10:15:25 | 1 |

**MR. CLARK:**  Okay.  You -- you indicated that

the agreement that's reflected in Exhibit 26 --

**MR. VICTORY:**  Right.

**MR. CLARK:**  -- is another term for the same

agreement that is attached as part of Exhibit 27, right?

It's one in the same?

**MR. VICTORY:**  Well, I don't recall exactly

what I said yesterday, but what I'm indicating to you today

is there were two agreements prior to Lloyd's paying its

policy limits, and both agreements, if they are Exhibit 26

or Exhibit 27, whatever, both of those agreements are no

longer in effect.

And then I referred to the stipulation, the

stipulation that we signed that we got Lloyd's dismissed

out of this case.

**MR. CLARK:**  All right.  The witness,

Mr. Huhta, was testifying about -- I believe about his

understanding that there was an agreement in place that

discussed the -- an agreement between the District and

Lloyd's regarding the allocation of any damages recovered

under the counterclaim.

**MR. VICTORY:**  I don't know if Mr. Huhta's

testimony referred to the existing agreements that are no

longer in effect or not.  So maybe you want to clarify that

to see where his testimony and his understanding is coming

| | | |
|---|---|---|
| 10:17:02 | 1 | from. |
| 7:03 | 2 | **BY MR. CLARK:   (Continuing)** |
| 10:17:03 | 3 | Q.   Mr. Huhta, do you -- is it your understanding |
| 10:17:05 | 4 | that there is some agreement in place between the District |
| 10:17:08 | 5 | and Lloyd's of London regarding the allocation of any |
| 10:17:14 | 6 | damages that may be awarded on the District's counterclaim |
| 10:17:17 | 7 | against Federated and TIG? |
| 10:17:20 | 8 | A.   I mentioned earlier that I was aware that |
| 10:17:25 | 9 | there was an agreement or agreements.  I have no idea of |
| 10:17:28 | 10 | the content.  And that recollection comes from a few years |
| 10:17:31 | 11 | ago.  It's -- it's not a recent recollection, so it's very |
| 10:17:35 | 12 | possible that it might be these expired agreements. |
| 7:39 | 13 | Q.   You don't know one way or the other? |
| 10:17:41 | 14 | A.   I don't know. |
| 10:17:42 | 15 | Q.   So what is your present understanding about |
| 10:17:47 | 16 | who would receive and retain any damages awarded on the |
| 10:17:53 | 17 | counter -- the District's counterclaim against Federated or |
| 10:17:59 | 18 | TIG? |
| 10:18:02 | 19 | A.   My understanding is the District would receive |
| 10:18:05 | 20 | the -- my monies. |
| 10:18:09 | 21 | Q.   And is it your understanding that the District |
| 10:18:11 | 22 | would not be obligated to pay any portions of those -- of |
| 10:18:14 | 23 | that recovery, if there was one, to Lloyd's of London? |
| 8:17 | 24 | A.   I do not know. |
| 10:18:19 | 25 | Q.   Who at the District had the primary |

**CV04-5052RBL**
**Houser Dec., Exh. A-7**

60

| | | |
|---|---|---|
| 10:18:23 | 1 | interaction with Lloyd's of London -- Lloyd's of London on |
| 8:27 | 2 | the recovery from Lloyd's of London on the insurance |
| 10:18:31 | 3 | contract? |
| 10:18:37 | 4 | A.   I don't know. |
| 10:18:38 | 5 | MR. CLARK:  Yeah, I'm not trying to be tricky, |
| 10:18:41 | 6 | Counsel, but we requested a -- this is Request No. 1 and |
| 10:18:47 | 7 | No. 3 -- |
| 10:18:49 | 8 | MR. VICTORY:  In your request for production |
| 10:18:51 | 9 | of documents? |
| 10:18:52 | 10 | MR. CLARK:  Yes, sir. |
| 10:18:53 | 11 | MR. VICTORY:  Okay. |
| 10:18:54 | 12 | MR. CLARK:  -- for copies of agreements |
| 8:56 | 13 | between Lloyd's and the District, and there were objections |
| 10:19:07 | 14 | to producing those requests. |
| 10:19:10 | 15 | So I'm just trying to determine if there is |
| 10:19:12 | 16 | another agreement out there in addition to the ones that |
| 10:19:15 | 17 | are reflected in Exhibits 26 and 27, and that will help me |
| 10:19:21 | 18 | dictate whether I need to ask him more questions about it. |
| 10:19:24 | 19 | MR. VICTORY:  Counsel, you need to ask |
| 10:19:26 | 20 | questions and find out.  I'm not testifying here today. |
| 10:19:29 | 21 | You have asked for request for production of documents and |
| 10:19:32 | 22 | you have our response. |
| 10:19:33 | 23 | MR. CLARK:  Are there other agreements between |
| 9:35 | 24 | the District -- |
| 10:19:36 | 25 | MR. VICTORY:  Counsel, I'm not testifying here |

CV04-5052RBL
Houser Dec., Exh. A-8

61

10:19:38   1    today.   I'm not under oath.

9:41   2         MR. CLARK:  So you won't tell me?

10:19:44   3         MR. VICTORY:   I don't think it would be proper

10:19:46   4    for me to respond to your questions since I'm not a fact

10:19:50   5    witness.

10:19:54   6         MR. CLARK:  Let's go off the record for a

10:19:56   7    minute.

10:19:56   8         MR. VICTORY:  Okay.

10:19:57   9         (Recess taken:  10:19 to 10:21.)

10:22:07   10   BY MR. CLARK:   (Continuing)

10:22:16   11        Q.   Let me change topics on you, Mr. Huhta.   I

10:22:19   12   want to ask you some questions about the District's

2:24   13       relationship and obligations vis-a-vis PacifiCorp.

10:22:29   14        Before the embankment failure in April of 2002

10:22:36   15   I understand that there was an agreement previously in

10:22:39   16   place about the percentage of energy that the District

10:22:43   17   would be entitled to that was energy generated by both

10:22:47   18   Swift No. 1 and Swift No. 2.

10:22:50   19        Is that true so far?

10:22:52   20        A.   Yes.

10:22:52   21        Q.   What was the percentage of energy that the

10:22:57   22   District was entitled to from Swift 1 and Swift 2?

10:23:01   23        A.   Twenty-six percent.

3:02   24        Q.   And that's 26 percent from both -- 26 percent

10:23:06   25   of the output from both of those two systems?

111

| 1 | STATE OF OREGON        )
| 2 |                        )  ss.    **Certified Copy**
|   | COUNTY OF MULTNOMAH    )

3

4        I, Kimberly J. Allen, RPR, CSR, CRR, hereby

5   certify that, pursuant to the Rules of Civil Procedure,

6   **GARY ALLAN HUHTA** personally appeared before me at the time

7   and place set forth in the caption hereof; that at said

8   time and place I reported in stenotype all testimony

9   adduced and other oral proceedings had in the foregoing

10  matter; that thereafter my notes were reduced to

11  typewriting under my direction; and the foregoing

12  transcript, Pages 1 to 109, both inclusive, constitutes a

13  full, true, and correct record of such testimony adduced

14  and oral proceedings had and of the whole thereof.

15         Witness my hand and notarial seal at Portland,

16  Oregon, this 30th day of June, 2005.

17

18

19                        Kimberly J. Allen, CSR, RPR, CRR

20

21

22

23

24

25

CV04-5052RBL
Houser Dec., Exh. A-10

# ⑬ Bullivant|Houser|Bailey ᴾᶜ

Attorneys at Law

DOUGLAS G. HOUSER
E-mail doug.houser@bullivant.com

February 3, 2004

*Via Facsimile and U.S. Mail*

G. Kevin Kiely
Cable Huston Benedict Haagensen & Lloyd, LLP
As Attorneys for PUD No. 1 of Cowlitz Co.
1001 SW Fifth Ave , Ste. 2000
Portland, OR  97204-1136

| Re: | Insured | : | Public Utility District No. 1 of Cowlitz County |
| | Federated Policy | : | 46 ARB 021-01A |
| | TIG Policy No | : | XPT 39238849 |
| | Date of Loss | : | April 21, 2002 |
| | Location of Loss | : | Cowlitz County, Washington |

Dear Mr Kiely:

We acknowledge receipt of your letter with enclosures dated January 29, 2004, as well as the letter with enclosures of the same date from attorney Brad Maxa on behalf of the PUD's broker, Bratrud Middleton.  In response to your invitation to examine the Board Minutes, we will contact you about finalizing arrangements to inspect those files at the District's offices in Longview on Monday, February 9, 2004.

As you know, Federated and TIG have investigated the PUD's claim under a full and continuing reservation of all rights and defenses.  Even though a number of Federated and TIG's question and document requests remain outstanding, and we would like to complete our inspection of the Board Minutes, Federated and TIG want to avoid any unnecessary delay and thus provide here their coverage decisions based on presently known information. This letter explains Federated and TIG's coverage decisions, and describes their approach for resolving any dispute that the PUD or its "Difference in Conditions" (DIC) insurers might have with the positions described below.

## **The PUD has not submitted evidence of a claim to covered property that exceeds the amount of insurance provided by the DIC insurance companies**.

The PUD has received payment and commitments from its DIC insurers at Lexington and Lloyds based on coverage under the DIC policies for the PUD's claimed losses.

300 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204-2089 • 503 228 6351  Fax 503 295 0915

www.bullivant.com   |   Seattle   Vancouver   Portland   Sacramento   San Francisco   Irvine   Las Vegas

C-SW10
00724

G Kevin Kiely
February 3, 2004
Page 2

Federated and TIG have requested from the PUD an explanation of why the PUD believes its
claimed losses exceed the DIC policy limits. Notwithstanding incomplete information
provided by the PUD to date on this subject, the PUD's documentation shows that the DIC
insurance coverage is as follows:

    Lexington Primary DIC policy no. 576/UF6246300: $5,000,000.

    Lloyd's Excess DIC policy no. 576/UF6246200: $65 million excess of $5 million.

    Lloyd's Excess Policy No. 576/UF6246400: $25 million excess of $5 million.

    Lloyd's Excess DIC policy no. 576/UF6246100: $40 million excess of $30 million.

TOTAL DIC Limits: $135 million.

The Lexington and Lloyd's insurance policies provide Business Interruption
Coverage that contain a sub-limitation on the amount of Business Interruption Insurance
provided to the PUD based on power lost "in a normal average year or the actual time to
replace, whichever is lesser." The stated annual average for Business Interruption values
within the DIC policies is $7,980,000.

Presently, the PUD has provided information that indicates that its total damages are
as follows·

| Repair of Physical Damage, including temporary/emergency repairs. | Approximately $61,012,571 (Exhibit 10 to the EUOs of Mssrs. Pfleeger and Huhta). |
|---|---|
| Business Interruption Loss, as of 9/19/03. | $7,876,644.42 (Document no. C-SW4 008258) |
| Extra Expense, as of 9/19/03 | $1,334,406.72 (Document no. C-SW4 008259) |

Federated and TIG dispute the accuracy of these figures, as explained more fully
below. Federated and TIG also contend that some of the damaged property is not "covered
property" and hence not fairly included within the PUD's claim. We also explain this below.
In addition, Federated and TIG fully reserve their rights to claim that the efficient proximate
cause of the damage is not a covered peril. Again, we explain this more fully below.

C-SW10
00725

G. Kevin Kiely
February 3, 2004
Page 3

Notwithstanding these reserved coverage defenses, the PUD's claim does not exceed
the stated limits of the DIC insurance policies. On this basis alone, the PUD has no claim
under the Federated and TIG insurance policies.

### The PUD's DIC insurance policies are primary.

We understand the PUD's position to be that the DIC policies should not be primary
under, but are excess to, the Federated and TIG policies. We question the PUD's motivation
in light of the Loan Receipt Agreement and undisclosed Litigation Agreement between the
PUD and Lloyds when making this contention. Regardless, the law and objective
circumstances show unequivocally that the DIC policies are primary to the Federated and
TIG coverage.

For instance, it is telling that the Lexington Insurance Company has paid its $5
million of primary DIC insurance limits without any reservation of rights to recoup any of
that money from either Federated or TIG. Lexington has recognized – as it must – that its
DIC coverage is primary to any and all other insurance without reservation or condition.

Written on precisely the same form as the Lexington policy, the Lloyd's policies can
be no different as a matter of law. In fact, as you may know, DIC insurance like the Lloyd's
policy form is not written on the same basis for the same perils as broad form coverage such
as that provided by the Federated and TIG policies. The DIC insurance is more specific, and
as a matter of law, it is primary insurance. In addition to the effect of legal precedent, the
Federated policy confirms this conclusion – not in an "Other Insurance" clause that would be
inapplicable in any event – but in an exclusion:

> "C.   Property Not Covered
>
> 6.   Property which is more specifically covered in whole
> or in part    under another insurance policy "

### The PUD's claimed loss does not accurately reflect the cost to repair the damage to covered property.

Subject to Federated and TIG's reservation of rights to rely on the full coverage
defenses described below, the Insurance Companies dispute the amount of the claim
submitted by the PUD to date.

For instance, we understand that the PUD's anticipated repair of the canal and
spillway, as called for by the Washington Group and the Board of Consultants, may cost
approximately $27.5 million, which includes engineering and consultant fees of over $5

---

C-SW10
00726

CV04-5052RBL
Houser Dec., Exh. B-13

02/03/2004 14:45 FAX          BULLIVANT HOUSER BAILEY                    ☒ 005

G. Kevin Kiely
February 3, 2004
Page 4

million. Federated and TIG believe the actual cost of that effort should be considerably lower.

Also, the PUD's repair of the canal will be a betterment of the previous construction, not a repair of like kind and quality. Federated and TIG understand that this betterment will address design deficiencies and will extend beyond the area of damaged land.

By way of further example, the PUD has submitted claims for legal fees, regulatory expenses and amounts attendant with the PUD/PacifiCorp contract that should not be included in the PUD's first-party insurance claim.

### The PUD's claimed loss includes the cost to repair property that is not covered by any insurance policy.

The Federated policy includes the following provision:

> "This policy does not cover:
>
> . . .
>
> 5.    Real estate values, land restoration, vegetation, land, growing crops, lawns and water."

The TIG policy conforms to this provision.

Federated and TIG understand that a portion of the PUD's claim is for damage to unimproved land, which is not covered under any of the PUD's first-party property insurance policies, including the DIC policies. This would reduce the amount of covered claim under even the DIC policies, thus further ensuring that those policies will cover the full extent of the PUD's covered claim.

### The PUD's claimed loss was caused by events that are excluded from coverage by the Federated and TIG insurance policies.

The Federated policy includes the following provisions:

#### D. Losses Not Covered

> 1.    Losses resulting from wear and tear, rust, corrosion, fungus, decay, hidden or latent defect, insects, vermin, smog, and mechanical breakdown.
>
> 2    Losses resulting from earth movement:

⊞⊞ www.bullivant com  |  Seattle  Vancouver  Portland  Sacramento  San Francisco  Irvine  Las Vegas

C-SW10
00727

CV04-5052RBL
Houser Dec., Exh. B-14

G. Kevin Kiely
February 3, 2004
Page 5

    a.    Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if loss or damage by fire or explosion results, Federated will pay for that resulting loss or damage.

. . .

3.    Losses resulting from water:

    a.    Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

    b.    Mudslide or mudflow;

    c.    Water that backs up from a sewer or drain; or

    d.    Water under the ground surface pressing on, or flowing or seeping through:

    (1)    Foundations, walls, floors or paved surfaces;

By separate, specific endorsement modifying the main policy form, the Federated policy excludes all collapse as follows:

6    Any collapse unless caused by or resulting from fire or lightening, windstorm, hail, smoke, explosion, riot, riot attending a civil strike, civil commotion, aircraft, vehicles, vandalism or malicious mischief, or weight of ice or snow.

In turn, the TIG policy adds the following provisions which operate in addition to those provided by the Federated policy:

This Agreement does not insure against loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

    A.    Earthquake, volcanic eruption, landslide, mudslide or any other earth movement unless loss by fire, explosion, civil commotion, smoke, vandalism or malicious mischief, or theft

C-SW10
00728

G. Kevin Kiely
February 3, 2004
Page 6

ensues; and then this Company shall be liable
for only such ensuing loss.

B.   Flood, surface water, waves, tidal water or tidal
wave, overflow of streams or other bodies of
water, or spray from any of the foregoing, all
whether driven by wind or not; water which
backs up through sewers or drains; water
below the surface of the ground including that
which exerts pressure on or flows, seeps or
leaks through sidewalks, driveways,
foundations, walls, basements or other floors,
or through doors, windows or other openings in
such sidewalks, driveways, foundations, walls
or floors – unless loss by fire, explosion, civil
commotion, smoke, vandalism or malicious
mischief or theft ensues – and then this
Company shall be liable for only such ensuing
loss.

C.   Actual, alleged, or threatened release,
discharge, dispersal or escape of toxic or
hazardous substances, contaminants or
pollutants, at any time regardless of whether
sudden or accident, all whether direct or
indirect, proximate or remote, or in whole or in
part caused by, contributed to or aggravated by
any physical damage insured by this
Agreement.  The term "pollutant" used in this
clause is defined as any solid, liquid, gaseous
or thermal irritant, including but not limited to
vapor, fumes, acids, alkalis, chemicals and/or
waste.

. . .

E.   Costs, expenses, fines or penalties incurred or
sustained by or imposed on the insured at the
order of any government agency, court or other
authority arising from any cause whatsoever.

Federated and TIG have determined that the PUD's claimed losses were
predominately caused by one or more of the aforementioned perils, acting in sequence or
concurrently without influence of any covered perils.  Specifically, Federated and TIG have
determined that the Swift Two embankment failure of April 1, 2002 was caused by

🐝 www.bullivant.com  |  Seattle  Vancouver  Portland  Sacramento  San Francisco  Irvine  Las Vegas

C-SW10
00729

G. Kevin Kiely
February 3, 2004
Page 7

underground water seepage and earth movement that, in turn, were predominately caused – if not exclusively caused – by latent defects.

### There is no Coverage for Business Interruption under the Federated and TIG policies.

As you know, the Federated and TIG policies provide no coverage for Business Interruption losses suffered by the PUD from the April 21, 2002 incident.

### Demand for Appraisal and Dec Action in the Event of Disagreement.

Federated and TIG hope that the PUD will acknowledge and agree with the coverage decisions expressed in this letter. As you and the PUD know, it would be unfair to Federated and TIG's other policyholders for Federated or TIG to pay an insurance claim that is not covered by the insurance policies, as is the case in these circumstances.

Nevertheless, we understand that the PUD may not agree with Federated and TIG's decisions, and that the PUD may have to disagree with Federated and TIG's decisions because of the PUD's recent new written agreements with Lloyds. For this reason, Federated and TIG demand Appraisal of the PUD's claimed loss and have filed a Declaratory Judgment Complaint in Federal Court today to address the issues presented here.

The primary threshold point of Federated and TIG's position is that the amount of the PUD's claim does not exceed the coverage provided by the DIC insurance. Any dispute over the amount of the PUD's claim is one that must be resolved by Appraisal based on the insurance contracts between the PUD on the one hand and Federated and TIG on the other hand. For this reason, and because Federated and TIG dispute the amount of the PUD's claim altogether, Federated and TIG demand Appraisal of the PUD's claimed loss pursuant to the terms of the Federated and TIG insurance policies.

Federated and TIG appoint Bob Redman, retired attorney in Yakima, Washington. Please advise of the identity of the PUD's Appraiser. The Appraisers can then attempt to agree upon an Umpire and we can proceed with an Appraisal without delay.

### Full Reservation of Rights to Dispute Coverage Pending Appraisal.

Federated and TIG's demand for Appraisal is made with a full reservation of all coverage defenses, including but not limited to the definitions of covered property, the relationship of Federated and TIG to the DIC insurance companies as excess insurance, and the application of exclusions for earth movement, water seepage, latent defect and collapse. Federated and TIG reserve the right to address these legal and factual issues before the

 www.bullivant com   |   Seattle   Vancouver   Portland   Sacramento   San Francisco   Irvine   Las Vegas

C-SW10
00730

CV04-5052RBL
Houser Dec., Exh. B-17

G. Kevin Kiely
February 3, 2004
Page 8

fedcral court in the Declaratory Judgment action, if necessary, following the Appraisal.
Federated and TIG also reserve the right to obtain preliminary legal rulings from thc court, as
necessary, to assist the Appraisal process.

### Enclosure of Acceptance of Service Document.

In the event that the PUD agrees with Federated and TIG's coverage decisions as
expressed above, please let us know by means of a succinct written acknowledgement within
the next 30 business days. Otherwise, please return the Acceptance of Service form as
required by Fed. R. Civ. Proc. 4(d) and provide us with the name and contact information for
your appraiser.

In conclusion, we remind you once again that the Insurance Companies continue to
fully reserve any and all rights and defenses which may now exist or which may arise in the
future. No waiver or estoppel of any kind other than the existing Tolling Agreement with
regard to the time in which to file suit is intended nor should be inferred. No other waiver or
estoppel of any kind is intended.

Thank you.

Very truly yours,

Douglas G. Houser

DGH:cs
cc:     Clients
        Lloyd's of London c/o its attorney Arjang Victory
        Michael McCormack

C-SW10
00731

CV04-5052RBL
Houser Dec., Exh. B-18

# ☲☲☲ Bullivant | Houser | Bailey PC

Attorneys at Law

DOUGLAS G. HOUSER
E-mail: doug.houser@bullivant.com

August 12, 2002

Barry J. Dahl
Legal Counsel
PUD #1 of Cowlitz County
P.O. Box 3007
Longview, WA  98632

|   | Re: | Insured | : | Public Utility District No. 1 of Cowlitz County |
|---|-----|---------|---|-------------------------------------------------|
|   |     | Federated Policy | : | 46 ARB 021-01A |
|   |     | Federated Claim | : | 46 GC 100374 |
|   |     | TIG Policy No. | : | XPT 39238849 |
|   |     | TIG Reference | : | A2-18180 |
|   |     | Policy Term | : | May 30, 2001 - May 30, 200 |
|   |     | Date of Loss | : | April 21, 2002 |
|   |     | Location of Loss | : | Cowlitz County, Washington |

Dear Mr. Dahl:

As attorneys for Federated and TIG ("the Insurance Companies"), we wish to acknowledge receipt by Mssrs. William E. Ballard and Norm Taylor ("the Independent Adjusters") of your letter dated July 31, 2002, received by the Independent Adjusters on or about August 2, 2002. Your letter is identified as the PUD's "Initial Proof of Loss." By acknowledging receipt of your letter, the Insurance Companies are neither accepting nor rejecting your letter itself as a Proof of Loss, nor are they accepting or rejecting the contents thereof.

As you know, the Insurance Companies continue to investigate the cause of the PUD's claimed loss in order to determine whether or not coverage is afforded for this claim under the applicable insurance policy(ies), and if so, to determine the scope of that coverage. The PUD should continue to communicate with the Independent Adjusters with additional information and documents as they become available to the PUD concerning its claimed loss. Likewise, the Independent Adjusters will communicate with the PUD with instructions and requests for information, as necessary.

We remind you that neither this letter nor any conduct related to the matter shall be construed as a waiver of, nor shall the Insurance Companies be estopped from asserting in the future, any rights and defenses being hereby expressly reserved. No representation, express or implied, by the Insurance Companies, their agents and/or representatives, of

300 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204-2089 • 503.228.6351  Fax 503.295.0915

www.bullivant.com  |  Seattle  Vancouver  Portland  Sacramento  San Francisco  Irvine

**TIG004876**

CV04-5052RBL
Houser Dec., Exh. C-19

Barry J. Dahl
August 12, 2002
Page 2

coverage for the claimed loss, shall be effective unless communicated in writing by the
Insurance Companies.

By undertaking this investigation and providing you with this letter, the Insurance
Companies are reserving their rights to assert the exclusions specified herein and any other
policy provisions that may become applicable as the investigation develops.

Likewise, the Insurance Companies respectfully continue to reserve any and all rights
and defenses that may now exist or that may arise in the future, specifically including, but
not limited to, the right to schedule Examinations Under Oath as a part of a Sworn Statement
in Proof of Loss, review and production of documents and Appraisal. No waiver or estoppel
of any kind is intended nor should any be inferred. Thank you.

                                        Very truly yours,

                                        /S/ DOUGLAS G. HOUSER

                                        Douglas G. Houser

DGH:cs
cc:     Interested Insurers
        Mr. Peter St. Denis
        William E. Ballard
        Norm Taylor

**BB** www.bullivant.com  |  Seattle  Vancouver  Portland  Sacramento  San Francisco  Irvine

**TIG004877**

CV04-5052RBL
Houser Dec., Exh. C-20

This is to certify that attached is a true and complete copy of the policy issued to P.U.D. No. 1 of Cowlitz County on behalf of TIG Insurance Company under policy number XPT 392 38 849.

In witness thereof, I have hereunto set my hand this 3rd day of December, 2003.

Richard Bennett
Vice President Property Underwriting



**DECLARATIONS**
**EXCESS PROPERTY POLICY**

**POLICY NUMBER:** XPT   392 38 849

**PRODUCER NUMBER: 629979**

**INSURED'S NAME & ADDRESS:**
P.U.D. No. 1 of Cowlitz County
Box 3007
Longview, WA  98632

**PRODUCER NAME:  Westrope & Associates**
COVERAGE IS PROVIDED BY:

TIG Insurance Company

ADMINISTRATIVE OFFICE: IRVING, TX.

INCEPTION:   5-30-2001                    EXPIRATION: 5-30-2002

At 12:01 a.m. standard time at place of issuance, the designated company (a stock insurance company, herein called the company), in consideration of the payment of the premium specified in this policy and subject to the limits of liability, exclusions, conditions and other terms of this policy (or as may be added by form(s) or endorsement(s) hereto) does agree with the insured named above (herein called the insured), to indemnify the insured for the amounts which the insured may be entitled to recover under the circumstances described in this policy and the endorsement attached hereto.

**Limit(s) of Recovery and Underlying Amount(s)** (Deductible, SIR or Primary Amounts)

$75,000,000 each occurrence excess of  $25,000,000 each occurrence.

**Joint Insured:** If more than one individual, firm corporation or other entity is named as an insured in this policy the following shall act for every insured for all purposes of this policy:

**Loss Payable Clause:** Loss, if any, to be adjusted only with the insured and payable to the insured and

N/A

**Policy Premium $**  50,000          **Other $**   N/A          **Total Due $** 50,000

This premium is based on: $166,576,800  in total 100% Total Insurable Values as of  5-30-2001   reported by the insured in the application or request for this insurance.

This policy is made and accepted subject to the conditions in this printed policy together with the provisions, stipulations and agreements contained in the following forms or endorsements which are attached to and form part of this policy:
  PUD#1FF 5-2001, ZC 1855D, EP18772 ,  AND ZC 26040

_____
SIGNATURE

_____
DATE OF ISSUANCE

EP 18838

CV04-5052RBL
Houser Dec., Exh. D-22

10-94

POLICY  000002


IN WITNESS WHEREOF, the Company has caused this policy to be signed by its president and secretary and countersigned on the declarations page by a duly authorized representative of the company.

TIG Insurance Company

SECRETARY                          PRESIDENT

TIG Premier Insurance Company

SECRETARY                          PRESIDENT

TIG Lloyd's Insurance Company

SECRETARY                          PRESIDENT

TIG Specialty Insurance Company

SECRETARY                          PRESIDENT

TIG Indemnity Company

SECRETARY                          PRESIDENT

TIG Insurance Company of Texas

SECRETARY                          PRESIDENT

TIG Insurance Company of Michigan

SECRETARY                          PRESIDENT

TIG Insurance Corporation of America

SECRETARY                          PRESIDENT

TIG Insurance Company of Colorado

SECRETARY                          PRESIDENT

Fairmont Insurance Company

SECRETARY                          PRESIDENT

TIG American Specialty Insurance Company

SECRETARY                          PRESIDENT

Industrial County Mutual Insurance Company

SECRETARY                          PRESIDENT

# EXCESS PROPERTY CONDITIONS

1. **MISREPRESENTATION AND FRAUD**

   This entire policy shall be void if, either before or after a loss, the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance of the subject thereof, or the interest of the Insured therein, or in case of any fraud or false swearing by the Insured relating thereto.

2. **AUDIT**

   It is agreed that the Company, or its authorized agent, shall at all reasonable times during the term of this policy and for a period of one (1) year subsequent to the expiration or cancellation effective date of this policy, have access to the books and records of the Insured for the purpose of determining the actual premium due hereunder or any other matter or matters pertaining to this insurance.

3. **IMPAIRMENT OF RECOVERY RIGHTS**

   As respect property covered situated:

   A) In or on premises at any location covered which is owned, leased, rented or operated by the Insured:

   This insurance shall not be invalidated should the Insured waive in writing any or all right of recovery for loss against any party, provided that if such waiver is made:

   (1) before loss has occurred, such waiver may be in favor of any third party.

   (2) after loss has occurred, such waiver shall only be in favor of a third party falling within one of the following categories at the time of loss:

   a) A THIRD PARTY INSURED UNDER THIS POLICY; or

   b) A CORPORATION, FIRM, OR ENTITY (a) OWNED OR CONTROLLED BY THE NAMED INSURED OR IN WHICH THE NAMED INSURED OWNS CAPITAL STOCK OR OTHER PROPRIETARY INTEREST, or (b) OWNING OR CONTROLLING THE NAMED INSURED OR OWNING OR CONTROLLING CAPITAL STOCK OR OTHER PROPRIETARY INTEREST IN THE NAMED INSURED; or

   c) A TENANT OF THE NAMED INSURED.

   B) At any other location or in transit:

   Any act or agreement by the Insured before or after loss or damage whereby any right of the Insured to recover in whole or in part for loss or damage to property covered against any carrier, bailee, or any other party is released, impaired or lost, shall render this policy null and void, but the Company's right to retain or recover the premium shall not be affected. The Company is not liable for any loss or damage which, without its written consent has been settled or compromised by the Insured.

4.  **OTHER INSURANCE**

    A)  If at the time of loss or damage, there is available to a named or unnamed Insured or any other interested party any other insurance which would apply in the absence of this policy, the insurance under this policy shall apply only as excess insurance over such other insurance.

    B)  Insurance in excess of the amount recoverable under this policy is not permitted unless the Company's permission is otherwise endorsed hereon.

5.  **PROTECTION OF PROPERTY**

In case of loss, it shall be lawful and necessary for the Insured, his or their factors, servants and assigns, to sue, labor, and travel for, in and about the defense, safeguard and recovery of the property insured hereunder, or any part thereof, without prejudice to this insurance; nor shall the acts of the Insured or the Company, in recovering, saving and preserving the property insured in case of loss be considered a waiver or an acceptance of abandonment The expenses so incurred shall be apportioned between the interests concerned in the ratio of their respective loss payments as finally settled.

6.  **NOTICE OF LOSS**

The Insured shall, as soon as practicable, report in writing to the Company, or its agent, every loss occurrence which may give rise to a claim under this policy.

7.  **EXAMINATION UNDER OATH**

The Insured, as often as may be reasonably required, shall exhibit to any person designated by the Company all that remains of any property herein described, and shall submit, and in so far as is within his or their power cause his or their employees, members of the household and others to submit to examinations under oath by any person named by the Company and subscribe the same; and, as often as may be reasonably required, shall produce for examination all writings, books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representative, and shall permit extracts and copies thereof to be made.  No such examination under oath or examination of books or documents, nor any other act of the Company or any of its employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which the company might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to the Company's liability.

8.  **PAIR, SET OR PARTS**

In the event of loss of or damage to:

    (a)  any article or articles which are a part of a pair or set, the measure of loss of or damage to such article or articles shall be a reasonable and fair proportion of the total value of the pair or set giving consideration to the importance of said article or articles, but in no event shall such loss or damage be construed to mean total loss of the pair or set:

    (b)  any part of property covered consisting, when complete for use, of several parts, the Company shall only be liable for the value of the part lost or damaged.

9.  **PROOF OF LOSS**

The Insured shall file with this Company, or its agent, within ninety (90) days from the date of discovery of the loss occurrence, a proof of loss signed and sworn to by the Insured, stating to the best knowledge and belief of the insured:

A)  The interest of the Insured and of all others in the property affected;

B)  The value of each item thereof and the amount of loss or damage thereto;

C)  All encumbrances thereon;

D)  All other contracts of insurance, whether valid or not, covering any of the property affected, and shall furnish a copy of all the descriptions and schedules in all such insurance policies, if required.

10.  **PAYMENT OF LOSS**

Upon final determination of the claim of the Insured, the Company shall promptly pay the Insured the amounts of any losses failing within the terms or limits of this insurance. All losses covered under this policy shall be due and payable by the Company within sixty (60) days after they are respectively claimed and proof of loss filed with the Company in conformity with this policy. Bankruptcy or insolvency of the Insured shall not relieve the Company of any of its obligations hereunder. However, no loss shall be paid under this policy, if the Insured has collected the amount of the loss or damage from others.

11.  **LOSS APPRAISAL**

If the Insured and this Company shall fail to agree to the amount of the loss or damage. then on the written demand of either party, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty (20) days of such demand.

The appraisers shall first select a competent and disinterested umpire. If the appraisers fail for fifteen (15) days to agree upon an umpire, then at the request of the Insured or this Company, the umpire shall be selected by a Judge of a Court of Record in the state where the loss or damage occurred.

The appraisers shall then appraise the loss or damage within a reasonable time and state separately the value (on the same basis as provided in the Recovery Provisions contained elsewhere in this policy) as of the date and time of the loss occurrence of each item lost or damaged and the amount of the loss or damage to each such item. If the appraisers fail to agree they shall then submit their differences to the umpire. An itemized award in writing of any two, when filed with this Company, shall determine the amount of value and the amount of the loss or damage to such items.

The Insured and this Company shall each pay his or its appraiser and shall bear equally the other expenses of the appraisal and the umpire. The Company shall not be held to have waived any of its rights by any act relating to appraisal.

3

2-89

POLICY 000006

12. **SUIT**

No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the Insured of the occurrence which gives rise to the claim, provided however, that if by the laws of the State within which this policy is issued such limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such State.

13. **SUBROGATION AND LOAN RECEIPT**

If, in the event of loss or damage, the Insured shall acquire any right of action against any individual, firm or corporation for loss of, or damage to, property covered hereunder, the Insured will, if requested by the Company, assign and transfer such claim or right of action to the Company or, at the Company's option, execute and deliver to the Company the customary form of loan receipt upon receiving an advance of funds in respect of the loss or damage; and will subrogate the Company to, or will hold in trust for the Company, all such rights of action to the extent of the amount paid or advanced, and will permit suit to be brought in the Insured's name under the direction of and at the expense of the Company.

14. **PRIVILEGE TO ADJUST WITH OWNER**

In the event of loss or damage to property of others held by the Insured for which claim is made upon the Company, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Company and the receipt of such owner or owners in satisfaction thereof shall be in full satisfaction of any claim of the Insured for which such payment has been made,

If legal proceedings be taken to enforce a claim against the Insured as respects any loss or damage, the Company reserves the right, at its option, without expense to the Insured, to conduct and control the defense on behalf of and in the name of the Insured. No action of the Company in such regard, shall increase the liability of the Company under this policy, nor increase the limits of liability specified in this policy.

15. **SALVAGE OR RECOVERIES**

When, in connection with any loss hereunder, any salvage or recovery is received, subsequent to the payment of such loss, the loss shall be figured on the basis on which it would have been settled had the amount of salvage or recovery been known at the time the loss was originally determined. Any amounts thus found to be due either party from the other shall be paid promptly.

The expense of all proceedings necessary to such recoveries shall be apportioned between the interests concerned in the ratio of their respective recoveries as finally settled. If there should be no recovery and proceedings are conducted solely by this Company, the expense thereof shall be borne by this Company.

16. **ABANDONMENT**

There can be no abandonment to the Company of any property.

17. **NO BENEFIT TO BAILEE**

This insurance shall in no way inure directly or indirectly to the benefit of any carrier or other bailee.

18. **NO REDUCTION IN AMOUNT OF INSURANCE**

The amount of insurance and the applicable limit of liability shall not be reduced by the amount of any loss covered hereunder.

19. **CHANGES**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

20. **CANCELLATION**

This policy may be cancelled by the Insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. Except as respects cancellation for nonpayment of premium, this policy may be cancelled by the Company by mailing to the Insured at the address shown elsewhere in this policy written notice stating when (not less than thirty (30) days) thereafter such cancellation shall be effective.

In the event of non-payment of premium, the Company may cancel this policy by mailing to the Insured at the address shown elsewhere in this policy written notice stating when (not less than ten (1 0) days) thereafter such cancellation shall be effective.

The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy term. Delivery of such written notice either by the Insured or by the Company shall be equivalent to mailing,

If the Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro-rata. Premium adjustment may be made at the time cancellation is effected. If not then made, premium adjustment shall be made as soon as practicable after the cancellation becomes effective. The Company's check or the check of its representative mailed or delivered as aforesaid shall be sufficient tender of any refund of premium due to the Insured,

21. **CONFORMITY TO STATUTE**

Terms of this policy which are in conflict with the statutes of the State wherein this policy is issued are hereby amended to conform to such statutes.

## EXCESS OF LOSS AGREEMENT OF INDEMNITY
## FOLLOWING FORM

**I.**   **INDEMNITY AGREEMENT**

In consideration of the premium stated in the "Declarations" and the terms, conditions and limitations in this Agreement, this Company agrees to indemnify the Insured for the Insured's "ultimate net loss" as defined in Paragraph V.A. Definitions below, in excess of an amount not less than the total sum of insurance afforded under the policy(ies) specified below in Paragraph II. Primary/Underlying Insurance It is a condition of this Agreement that indemnity provided herein shall apply only after all primary and other underlying insurance has been exhausted.

Except as provided elsewhere in this Agreement, the indemnity provided by this Agreement shall follow the terms, conditions, and definitions of coverage and recovery stated in the policy(ies) of the primary and other underlying policies specified in Paragraph II. Primary/Underlying Insurance, except for the limits of liability, any renewal agreement or cancellation provision, and any obligation to investigate or defend.

**II.**   **PRIMARY/UNDERLYING INSURANCE**

A.   The Insured warrants, and it is a condition of this Agreement, that primary and other underlying insurance (hereafter both to be called "underlying insurance"), with total combined limits of liability in an amount not less than as specified below for each and every loss occurrence, is in full force and effect at the inception, and during the period of this Agreement.  If said underlying insurance is not maintained in effect by the Insured, or if there is any change in the scope of coverage of said underlying insurance, the indemnity provided by this Agreement shall then apply in the same manner as though said underlying insurance policy(ies) had been so maintained and unchanged.

B.   Schedule of Underlying Insurance

1.   Primary Underlying Policy(ies)

Company:  Federated Rural Electric Insurance Exchange

Policy No.  46ARB021-01A

Policy Term:  From  **5-30-2001**     To  **5-30-2002**

Limits of Liability:  **$ 75,000,000** in each and every loss occurrence excess over and above deductible and/or self-insured retention amount(s) borne by the Insured (hereafter called "applicable deductible[s]") as per copy of this primary underlying policy on file with this Company, on property situated in or on premises at:

**Per schedule on file with the Company**

2.   Other Underlying Policy(ies)

See Endorsement  **# N/A** attached to, and forming part of, this Agreement.

C.   Total Sum of Underlying Insurance Limit(s)

**$    25,000,000** each and every loss occurrence plus applicable deductible(s) as per copy of the

**CV04-5052RBL**
**Houser Dec., Exh. D-29**
POLICY  000009

primary underlying policy on file with this Company. In no event shall the indemnity provided by this Agreement attach at an amount less than this Total Sum.

## III.  COVERAGE PROVIDED BY THIS AGREEMENT

Direct loss of physical loss or damage to Real Property, Personal Property and Time Elements

## IV.  EXCESS LIMIT OF LIABILITY AND PARTICIPATION

This Company shall be liable for each and every loss occurrence, irrespective of the number and kinds of risks involved, for **100 %**  of the ultimate net loss to the Insured excess over and above $ **25,000,000** (see Paragraph II Primary/Underlying Insurance), in each and every loss occurrence.  In no event, however, shall the total limit of recovery under this Agreement exceed the lesser of the following:

A.      $ **75,000,000** in any one loss occurrence.

B.      The interest of the Insured.

The inclusion of more than one Insured shall not operate to increase this Company's Limit of Liability.

## V.  SPECIAL DEFINITIONS

For the purposes of this Agreement, the following words and terms are defined and limited as follows:

A.      "Ultimate net loss" shall mean the actual loss sustained by the Insured as a direct result of the perils insured against by the policy(ies) specified in Paragraph II. Primary/Underlying Insurance, after making deductions for: deductible(s) and/or other self-insured retention(s) to be borne by the Insured, salvage recoveries and all other recoveries except this Agreement.

B.      "Loss occurrence" shall mean the total loss by perils insured against arising out of a single event.

C.      "Premises" shall mean the building(s) or that portion of the building(s) including the area within 100 feet thereof, at the location(s) specified in Paragraph II.B.1 Primary/Underlying Insurance, occupied by the Insured for the business purpose conducted.

D.      "Primary underlying insurance" and other "underlying insurance" shall mean insurance policies specified in Paragraph II.B. Primary/Underlying Insurance which provide coverage for the property, interest and perils insured by this Agreement.

E.      "Pollutant" shall mean any solid, liquid, gaseous, or thermal irritant, including but not limited to vapor, fumes, acids, alkalis, chemicals and/or waste.

## VI.  SPECIAL EXCLUSION

This Agreement does not insure against loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

A.      Earthquake, volcanic eruption, landslide, mudslide or any other earth movement unless loss by fire, explosion, civil commotion, smoke, vandalism or malicious mischief, or theft ensues; and then this

Company shall be liable for only such ensuing loss.

B.   Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not; water which backs up through sewers or drains; water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows or other openings in such sidewalks, driveways, foundations, walls or floors - unless loss by fire, explosion, civil commotion, smoke, vandalism or malicious mischief or theft ensues - and then this Company shall be liable for only such ensuing loss.

C.   Actual, alleged, or threatened release, discharge, dispersal or escape of toxic or hazardous substances, contaminants or pollutants, at any time regardless of whether sudden or accidental, all whether direct or indirect, proximate or remote, or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this Agreement. The term "pollutant" used in this clause is defined as any solid, liquid, gaseous or thermal irritant, including but not limited to vapor, fumes, acids, alkalis, chemicals and/or waste.

D.   1.   Asbestos removal.

2.   Demolition or increased cost of reconstruction, repair or debris removal necessitated by the enforcement of any law or ordinance regulating asbestos removal.

3.   Any governmental direction or request declaring that asbestos present in or part of or utilized on any undamaged portion of the Insured's property can no longer be used for which it was intended or installed and must be removed or modified.

E.   Costs, expenses, fines or penalties incurred or sustained by or imposed on the Insured at the order of any government agency, court or other authority arising from any cause whatsoever.

## VII.   ALL OTHER MATTERS

All matters not provided for herein shall be governed by the terms and conditions of this Company's printed policy to which this Agreement is attached and which has been issued in conjunction herewith. The foregoing clauses shall, however, be considered to supersede and annul any clause or clauses therein which may be of the same or similar effect.

ATTACHED TO AND FORMING A PART OF POLICY NUMBER:   XPT 392 38 849

ISSUED TO:  Public Utility District #1 of Cowlitz County

BY:     TIG Insurance Company

EFFECTIVE:     5-30-2001

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## YEAR 2000 / DATE CHANGE EXCLUSION

THIS ENDORSEMENT MODIFIES COVERAGE UNDER ALL COVERAGE FORMS INCLUDED IN THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED UNLESS STATED BELOW.

A. This insurance does not apply, in whole or in part, to any injury, damage, loss, claim, cost or expense, whether preventative, remedial, replacement, statutorily mandated or otherwise, directly or indirectly arising out of, resulting from, related to or involving:

   1. Any actual, alleged, anticipated, potential or threatened failure, malfunction, inadequacy or degradation in performance of:

      a. Any of the following, whether owned, used, licensed, leased by or to, or in the care, custody or control of the insured or any other person or entity, including those for whom the insured is or may be responsible or legally liable:

         1) All computer software;

         2) All middleware;

         3) All computer hardware and computer peripherals

         4) Any device that stores, retrieves, processes, transmits or presents data, including but not limited to embedded chips, microprocessors, mainframe computers, personal computers, computer networks, local and wide area networks, routers, hubs, switches and bridges and any and all like or related items, including components thereof; or

         5) Any other computerized or electronic equipment, components or devices; or

      b. Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph A.1.a. of this endorsement;

      due to the inability to correctly recognize, process, distinguish, interpret or accept any data containing dates, date changes or date values prior to, during or after the year 2000, including but not limited to, leap year calculations;

   2. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to assess, rectify, test for or monitor that which is described in paragraph A.1. of this endorsement;

   3. Any rendering of or failure to render advice, consultation or review concerning a person's or entity's obligations to report, respond, disclose or otherwise address that which is described in paragraph A.1. of this endorsement;

   4. Any wrongful or inaccurate disclosure or failure to disclose the impact or potential impact on the insured's operations as a result of that which is described in paragraph A.1. of this endorsement; or

   5. Any actual or alleged failure to exercise appropriate business judgment in relation to that which is described in paragraph A.1. of this endorsement.

CV04-5052RBL
Houser Dec., Exh. D-32

POLICY  000012

**B.** With respect to coverage afforded under the following forms:

BOILER AND MACHINERY COVERAGE
BUSINESSOWNERS COVERAGE
COMMERCIAL CRIME COVERAGE
COMMERCIAL INLAND MARINE COVERAGE
COMMERCIAL PROPERTY COVERAGE
MANAGED HEALTHCARE REHABILITATION BUILDING AND PERSONAL COVERAGE
MANUFACTURERS OUTPUT COVERAGE
STANDARD PROPERTY POLICY
TUX PROPERTY COVERAGE

The exclusion does not apply to ensuing loss or damage resulting from one of the following causes of loss:

   a.   Fire, lightning, explosion, windstorm and hail;
   b.   Smoke, aircraft or vehicles, riot or civil commotion;
   c.   Vandalism, leakage from fire extinguishing equipment, sinkhole collapse;
   d.   Volcanic action, falling objects, weight of snow, ice or sleet;
   e.   Water damage , employee dishonesty, elevator collision resulting from mechanical breakdown or;
   f.   Theft, robbery and burglary, and safe burglary.

if such loss would otherwise be covered by such form shown above in this paragraph B.

**C.** Further with respect to coverage afforded under the following forms:

EQUIPMENT BREAKDOWN COVERAGE
MANAGED HEALTHCARE REHABILITATION BUILDING AND PERSONAL PROPERTY
COVERAGE

The exclusion does not apply to ensuing loss or damage resulting from Accident to Covered Equipment if such loss would otherwise be covered by such form shown above in this paragraph C.

ZC 26040                2        07/1999

ENDORSEMENT # 1

**INSURED:**    P.U.D. No.1 of Cowlitz County

**PRODUCER:**    Westrope & Associates

**POLICY NO.**    XPT 392 38 849

**EFFECTIVE:**    5-30-2001

---

In consideration of the premium already charged, it is hereby understood and agreed that this policy excludes coverage provided under Section II Public Liability of the underlying policy issued by Federated Rural Electric Insurance Exchange Policy No. 46 ARB 021-01A.

All other terms and conditions remain unchanged.

_____
**Authorized Signature**

_6/29/2001_
**Date Signed**

Page 1 of 1

CV04-5052RBL
Houser Dec., Exh. D-34

POLICY 000014

## MAXSON YOUNG®

ASSOCIATES, INC.

19324 40th Avenue W., Suite C
Lynnwood, WA 98036
Tel:       (425) 778-3810
FAX:     (425) 778-4375



International Adjusters

May 21, 2002

Steve Larkin Direct (425) 640-4540

Interested Insurors & Underwriters
(See Attached Schedule of Insurors)

Re:     Report No. 1           :      Preliminary
        Assured                :      **PUD NO. 1 OF COWLITZ**
        Policy No.             :      576/UE3617800
        Policy Term            :      November 17, 2001/02
        Date of Loss           :      April 21, 2002
        Type of Loss           :      Property Damage
        Producing Broker       :      Bratrud Middleton – Longview, WA
        Our File No.           :      03.001284.MI-L
        Your Claim No.         :      Various

Gentlemen:

We herewith submit our preliminary report regarding the above referenced property loss
for your consideration.

### ENCLOSURES:

1.  Schedule of Insuror & Apportionment
2.  Photographs Taken by Maxson Young Associates
3.  CH2M HILL Memorandum, April 28, 2002: "Report on Failure of Swift No. 2 Power
    Canal Embankment (FERC Project No. 2213)"
4.  Federal Energy Regulatory Commission (FERC) Report for Period August 30, 1999 –
    June 15, 2001
5.  Local Media Coverage:
    a.  Seattle Post Intelligence – Associated Press – Article dated April 22, 2002
    b.  KOMO TV Release, April 21, 2002
6.  JRP  Engineering Letter and Document Request, April 24, 2002
7.  Excerpts from Moss Adams Insurance Report, June 1, 2000

MYI
00001

Atlanta • Boston • Chicago • Houston • Kansas City • Los Angeles • Miami • New York • Portland • San Francisco • Seattle • Tampa • Washington, D.C.
Santa Cruz • Buenos Aires • Caracas • Hong Kong • Lima • London • Mexico City • Santiago

CV04-5052RBL
Houser Dec., Exh. E-35

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 2

8. Bratrud Middleton "Summary of Catastrophe Insurance Policy – November 17, 2001 –November 17, 2002"
9. Primary Layer Coverage Form for Term November 17, 2000 – November 17, 2001
10. Excess Coverage Form for Term November 17, 2000 – November 17, 2001
11. Statement of Values
12. Agreement between PacifiCorp and PUD
13. Letter from RGL with Preliminary Estimate, May 15, 2002

## ABSTRACT OF COVERAGE:

- All risk of direct physical loss or damage excluding fire, lightning, explosion, or breakdown of boilers and machinery.
- All Real and Personal Property including use and occupancy and contingent use and occupancy.
- Deductible: $500,000 each and every occurrence except earthquake and flood which is 5% of total insurable value of locations involved.

Please refer to attached Schedule of Insurors and Apportionment. The policy for the term 2001 – 2002 has just been issued and a copy is being dispatched to us.

## DATE OF LOSS:

April 21, 2002

## LOCATION OF LOSS:

Swift No. 2 Hydroelectric Generation Project
Cougar, WA 98616

## NATURE OF LOSS:

Power canal embankment failure.

## PROPERTY INVOLVED:

Power canal, powerhouse, switchyard, and related equipment.

## ESTIMATE OF LOSS:

| | |
|---|---|
| Physical Damage | $65,000,000 |
| Use and Occupancy (18-months) | 9,000,000 |
| **Total** | **$74,000,000** |

MYI
00002

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 3

Please refer to our Damage caption later in this report for a discussion and greater detail. The above estimation does not take into account coverage considerations including limitations and deductible application.

## INVESTIGATION:

### Assignment:

This assignment was received by the undersigned on Tuesday, April 23, 2002. The Assured was contacted and loss was inspected on date of assignment.

### Assured:

**Public Utility District No. 1 of Cowlitz County**

The General Manager for the District is Mr. Dennis P. Robinson. The Deputy Manager and Director of Customer Services is Mr. Ronald G. Worthington. Mr. Michael (Mick) J. Petersen, CPA is Controller/Treasurer. Their mailing address is: P.O. Box 3007; Longview, Washington 98632. Their phone number is (360) 423-2210.

Bratrud Middleton Insurance, Longview, Washington is the producing agency. The principal account executive is Mr. Peter F. St. Denis, CPCU, ARM, Vice President. His assistant is Ms. Lesley Lepin.

Willis has assigned two claim professionals to assist the Assured: Mr. Philip C. Gale, Vice President Willis of Portland; and Ms. Elaine Peck, AIC, AIS, Claims Consultant, Willis of Seattle.

### Risk:

Specific to this loss is the Swift No. 2 hydroelectric project located on the Lewis River in the state of Washington. The Lewis River flows past the southern flank of Mt. St. Helens and runs a 90-mile path before emptying into the Columbia River near Woodland, Washington. There are four hydroelectric projects on the Lewis River: Swift No. 1; Swift No. 2; Yale; and Merwin. Swift No. 2 operates under Federal Energy Regulatory Commission license No. 2213. It is owned by Cowlitz County PUD No. 1 (PUD)



MYI
00003

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 4

and is operated under a joint agreement with PacifiCorp.

The PUD and PacifiCorp share in the power output from Swift No. 1 and No. 2. The PUD receives 26% of the combined power output.

Swift No. 1 is a 240 MW hydroelectric facility which is owned and operated by PacifiCorp and was built in 1958 at Swift Dam, a 512' earthen dam. The discharge from Swift No. 1 enters an earthen power canal that funnels water approximately 3 miles to Swift No. 2, a 70 MW hydroelectric facility.

These projects were designed and built by Bechtel Corporation and put into operation into 1959. The following diagram illustrates the layout plan of Swift No. 2 facility:



The forebay of the canal is widest at the area where the intake structure is located with the powerhouse located immediately below. Water flows into the intake structure through a penstock to the powerhouse and exits to the tailrace. The switchyard is located in the proximity of the powerhouse, several hundred yards to the southwest.

An important characteristic of this site is its geology with the foundation of the power canal comprised of basalt lava. This foundation may have played a role in the cause of

MYI
00004

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 5

this loss.

## Origin of Loss:

On Sunday, April 21, 2002 at approximately 5:25 a.m. the embankment of the Swift No. 2 power canal failed and resulted in the release of water from the power canal. The breach of the power canal embankment occurred near the intake structure which is in close proximity to the powerhouse allowing significant damage to the facility as well as appurtenant structures, transforms and the near by switchyard. At the time of this incident, this facility was not operating due to low power demand, under a scheduled shutdown that would return the plant to operational status after the weekend. The Swift Project provides approximately 10% of PUD power needs.

We have obtained a report from CH2M Hill, consulting engineers retained by Cowlitz County PUD which provides substantive information pertaining to the sequence of the failure and preliminary conclusions as to conclusions. CH2M Hill states:

> *The events leading up to the failure occurred very rapidly and unexpectedly. A Swift No. 2 communication RTU failed at 3:50 AM and was the first note of any problems. At 4:00 AM, a high sump alarm sounded at Tom Lee (hydro plant operator for PacifiCorp) was notified by the PacifiCorp Hydra Control Center (HCC) at Merwin. Since both Swift plants were off-line at the time Tom Lee advised the HCC operator that he would check the sump when he reported for duty later that morning. At 5:25 a.m., the Swift No. 2 canal pool elevation telemetry indicated low water levels had occurred in the power canal. Tom Lee was again notified and he prepared to go to the site to investigate. He arrived at 5:45 AM.*

> *It should be noted that security personnel reported that they stopped at the Swift No. 2 powerhouse at approximately 1:30 a.m. to conduct a routine inspection of the powerhouse and switchyard, but did not observe anything unusual at that time.*



Photo taken by Pacific Corp Employee at time of embankment failure

MYI
00005

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 6

> *The first observed sign of imminent failure occurred at 5:35 AM when security arrived at the site and found water running across the road...*[1]

The escaping water from the power canal washed out the road, State Hwy. 503; and caused the powerhouse to sustain substantial damage as it was literally filled with sediment and boulder debris. The switchyard was similarly covered with sediment which has been estimated to approach a depth of 3-ft. Two transformers were dislodged from their foundations and tipped over, one of which was carried several yards from the powerhouse while discharging approximately 23,000-gallons of oil. Foss Environmental was brought in to contain the oil and reduce the environmental impact to nearby Yale Reservoir.

CH2M Hill has submitted their preliminary findings as to the causes of the failure. They note the following observations:

> *"A large sinkhole was observed to have developed along the north side of the canal forebay, approximately 500-ft. upstream from the failed canal embankment. The dimensions of the irregular shaped sinkhole were measured to be about 95-ft. long by up to 65-ft. wide. The depth of the sinkhole was about 12-ft. long on an average and a minor amount of water was left standing in the bottom. The sides of the sinkhole were extending with near vertical slopes and material consisting of well-graded sand, gravel and cobbles. Blends of sand and silky materials were noted also and silky sand was found to be deposited in the base of the sinkhole where the water was left standing.*

> *One or more large cracks were noted emanating from the sinkhole in the long arcuate shape leading directly to the breach area at the failed canal embankment about 500-ft. to the south of the sinkhole...."*[2]



Sinkhole in forebay referenced by CH2M Hill

---

[1] CH2MHill "Report on Failure of Swift No. 2 Power Canal Embankment (FERC Project No. 2213)" at pages 2 and 3.
[2] CH2M Hill Report on "Failure of Swift No. 2 Power Canal Embankment (FERC Project No. 2213) on page 5.

MYI
00006

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 7

The following observations were made by CH2M Hill:

> "...below the breach area of the embankment, the flow of water from the
> canal had scoured the embankment and overburden soils from above the
> foundation rock, and the foundation basalt flows were exposed extensively
> throughout the foundation of the breach area. The rock surface was
> inspected for defects. Defects that were found were noted to consist of
> open cavities where trees had been deposited within the lava flows. The
> diameter of the tree voids were observed to vary from about 6-inches to
> about 14-inches......The largest lava tube was measured to be about 6-ft.
> wide and partially filled with well graded sand, gravel and cobbles.....This
> largest lava tube cavity was viewed with the aid of a spotlight and could
> be observed extending into the exposed basalt rock to a distance estimated
> to be 20-ft. or more....."[3]

CH2M Hill provides the following commentary with regard to causation:

> "These preliminary investigations indicate that the failure of the
> canal dike was likely associated with flow through previously
> undetected lava tubes in the basalt/lava rock foundation of the dike
> adjacent to the intake structure. Flow from these lava tubes may
> have lead to piping erosion of the natural formation underlying the
> power canal. This erosion, appears to have lead to the large
> sinkhole in the power canal about 500-ft. northeast of the breach.
> A strong pattern of cracking and voids were found to lead between
> the sinkhole and breached section of the canal embankment...."[4]

CH2M Hill indicates that additional field investigation is necessary before final
conclusions can be reached.

### FERC Inspection – June 2001:

We have obtained a copy of the Federal Energy Regulation Commission Report for the
period of August 1999 to June 15, 2001. That report states: "No safety problems related
to the structural conditions or operation of the project features were observed."

The report describes the observed conditions of dams, dikes and appurtenant structures.
It states:

> "No apparent problems were observed relative to the earth dikes, forebay,
> and concrete power intake structure. Except for a few small trees and

---

[3] CH2M Hill "Report on Failure of Swift No. 2 Power Canal Embankment..." , page 6.
[4] CH2M Hill "Report on Failure of Swift Nor. 2 Power Canal Embankment...", page 6 and 7.

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 8

> *unwanted vegetation at the crest and upstream slopes, the power canal*
> *earth dikes appear to be in stable condition and well maintained. The*
> *crest and outer and inner slopes of the dikes did not show any apparent*
> *cracking, depressions or small animal burrows. Several minor seepage*
> *areas were noted at the toe of the dikes. The seepage's monitored and*
> *measured through V-notch weirs....."*

The following instrumentation was in place for the monitoring of the behavior of
the project structures:

- Four settlement survey monuments at the crest of the power dikes
- Nine piezoneters at the dikes
- Six weirs at the toe of the dikes

Annual leakage tests are performed and results recorded. The report concludes:

> *"There were no safety problems identified or observed at the*
> *project during the inspection. All the project features appear to be*
> *in good condition. PUD continues to operate the project in a safe*
> *and acceptable manner."[5]*

Despite the intense efforts of engineers, the assessment of the property damage remains at
an early stage. Immediately following the event, the insured initiated wide-ranging
efforts to mitigate damage and respond to immediate concerns regarding safety, access,
and environmental cleanup. The insured utilized their project engineer, CH2M Hill, to
assist in the implementation of their response plan and Foss Environmental was retained
and immediately responded to the oil that escaped from the transformers. Containment
devices were installed and the oil was contained and removed.

Initial efforts also included stabilization efforts for a transmission tower that fell against
the powerhouse during the event. Stabilization efforts included a crane that was brought
in to aid in its removal. While on site, transformers were uprighted and relocated to the
switchyard where their condition can be evaluated.

The District proceeded to cleanup and stabilize the site, efforts which included
considerable amounts of earthwork adjacent to the powerhouse and at the tailrace. The
lower section of the metal siding of the powerhouse was also removed as it posed a safety
hazard.

---

[5] FERC Report dated 7/25/01 at pages 1 and 3.

MYI
00008

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 9

The State Department of Transportation built a single lane road to enable continued area access. State efforts were expedited due to accessibility concerns for the opening day of fishing season, Saturday, April 27th.

In order to meet State Fishery runoff requirements from the Swift Dam, the District built an earthen dam at the spillway gates and diverted the water flow through the spillway structure to the abandoned river channel.

Swift No. 1 was brought back on line on Saturday, April 27th. The power was gradually ramped up to a level of 5,000 CFS. Although the design capacity is 9,000 CFS, there has been constraints placed upon production due to spillway bank erosion. The spillway will be shut down during non-peak time (a weekend) during which stabilization efforts to the spillway canal embankment will be undertaken. Such scheduling efforts will minimize adverse impact on optimum production levels.



Earthen dam installed at the spillway

CH2M Hill has recently appointed a project manager and is in the process of developing an assessment plan, both with respect to causation and damage. Efforts are being made to coordinate this investigation to minimize impact on plant operations.

**Prior Occurrence:**

In 1973, the power canal experienced a similar occurrence. However, in that occurrence, complete embankment failure did not occur. Water was observed escaping through holes in the embankment and the power canal was evacuated prior to catastrophic failure. Repairs to the embankment at that time exceeded $1.2 million dollars and included installation of a concrete trough along a portion of the embankment to the intake structure. The area of the embankment that failed during this occurrence did not have

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 10

such a trough, which was apparently installed in order to prevent the undermining of the embankment.

Our investigation will examine the 1973 failure and its relationship to this occurrence.

**Subrogation:**

Our investigation regarding the cause of the embankment failure is at a preliminary stage. As information is developed, any third-party recovery opportunities will be closely examined and evaluated.

**DAMAGES:**

**Physical Damage:**

Initial efforts have been focused towards stabilization of the site and mitigation of damage. The following values for this location were reported effective November 17, 2001.

| Description | Value |
|---|---|
| Power Canal - Swift No. 2 Powerhouse | $34,335,000 |
| Transformers O/S Yard Property | 15,052,000 |
| Personal Property of Insured | 42,600,000 |
| Total Value (at this location) | $91,987,000[6] |

These values were taken from a report prepared by Moss Adams, LLP. The values indicated in that report are as follows:

| Location | Property | Property Type | Replacement Value |
|---|---|---|---|
| Location #86 | 3.2 mile Power Canal | Buildings/Improvements | $34,334,871 |
| Location #75 | Swift #2 Generating Station | Building/Improvements | 15,051,576 |
| Location #75 | Swift #2 Generating Station | Personal Property | 42,600,084 |
| | | Total | $91,986,532 |

The property described at Location #75, Swift No. 2 Generating Station, is as follows:

| Quantity | Description |
|---|---|
| 1 | Furniture and Fixtures (lot) |

---

[6] Statement of Values provided by Bratrud Middleton Insurance.  Refer to Enclosure #10.

MYI
00010

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 11

| | |
|---|---|
| 2 | Lube Oil Equipment Deladal |
| 1 | Plant Water Piping (lot) |
| 1 | Water Pumps and Tanks |
| 2 | Turbines and Generators, 4600 HP Turbine, 35,000 KW Generator |
| 1 | Accessory Electrical Equipment (lot) |
| 1 | Transformer Switch Gear |
| 1 | RFL Remote Operation System with controls at Generating Plant and operating controls at Merwin |
| 2 | Air Compressors |
| 1 | Fire Protection System with Tank |
| 1 | Air Piping |
| 1 | Bridge Crane 225-ton Main, Auxiliary 25-ton |
| 1 | Steel-framed Building with concrete 2-level room and Control Room, dimensions 58-ft. wide x 140-ft. long x 50-ft. high[7] |

Damage assessment is at a very early stage with geologist currently examining the power canal in an effort to determine the cause(s) and mechanisms of failure. This investigation will concurrently be used in development of a scope of repair, a scope which will be scrutinized by Federal and State regulatory authorities with the resulting implications unknown at this time.

The powerhouse sustained significant damage. It appears that although the steel structure and concrete foundation are salvageable, the steel siding and roofing will require replacement. Due to the amount of settlement and earth debris deposited within the powerhouse, assessment of the equipment damage has not commenced. We remain hopeful that because the turbines were situated in a relatively protected area, repairs may be economically viable. Electrical controls will require replacement and the bridge crane appears to be salvageable as it was high enough not to have sustained any significant damage.

The switchyard were submerged in earthen debris and based upon our examination of the perimeter fencing, it appears as much as 3-ft. of earth materials have been deposited on the pad. Excavation of this area will have to occur and specific assessment of damage accomplished. Towers and equipment have been relocated.

The intake structure and penstock are believed to have sustained minor damage with repairs limited to cleanup of settlement and debris. The tailrace was destroyed and will require replacement.

We are awaiting an inventory of equipment at this location from the PUD. This will be helpful in our efforts to evaluate the loss.

---

[7] Moss Adams Advisory Services, Cowlitz County PUD No. 1 Insurance Report as of June 1, 2000, pages 8, 31, and 32. Refer to Enclosure #7.

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 12

Based upon our initial survey, we have developed an order of magnitude for the purposes of establishing reserves:

| Property | Estimate |
|---|---|
| Power Canal | $10,000,000 |
| Power House (Building) | 3,000,000 |
| Generating Equipment | 35,000,000 |
| Electrical Distribution Equipment | 10,000,000 |
| Tail Race | 2,000,000 |
| Subtotal | $60,000,000 |
| | |
| Mitigation & Cleanup | $ 1,500,000 |
| Engineering & Professional Fees | 3,500,000 |
| | |
| **Total** | **$65,000,000** |

The summary presented above is based upon our preliminary observations and discussions with consulting engineers. It has been developed with the purposes of establishing reserves and in order of magnitude. The above estimation includes anticipated costs to comply with ordinances and regulations pertaining to rebuilding.

### Use and Occupancy:

The insured has advised us that they calculated their annual business interruption value at $7.9 million dollars. Katharyn Thompson, CPA, RGL, has been retained to assist in our analysis of the business income and extra expense loss. The PUD has not been in a position to provide any substantive information pertaining to the potential income loss. Limited information has been made available to our accountant to permit a calculation of the PUD cost to purchase the loss power from Swift No. 2 from outside vendors. RGL's potential business income and extra expense estimate for a 6-month period is $3,440,000. Presently, we are estimating the period of interruption to be 18-months. This will need to be revisited as more information becomes available and decisions are made by the PUD regarding repairs.

Another issue that has developed is the PUD's participation in the output of Swift No. 1. There has been considerable discussion between the PUD and Pacific Corp regarding that output. It is unresolved at this time whether the PUD will benefit from the Swift No. 1 output. There are a number of potential issues regarding the use and occupancy aspects of this loss that need to be carefully reviewed and examined.

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 13

## EXPERTS:

The following team of experts and consultants has been assembled to respond on behalf of the Interested Insurors and Underwriters:

### Causation/Damage Assessment:

- James R. Perrault, P.E./S.E., JRP Engineering
  2150 N. 107th St., Suite 375
  Seattle, WA 98133
  (206) 361-7100

- John Zipper, P.E., Geotechnical Engineer
  Zipper Zeman Associates, Inc.
  18905 33rd Ave. W., Suite 117
  Lynnwood, WA 98036
  (425) 771-3304

- Alan R. Ball
  Douglas Peterson & Associates
  13 Newell Court
  Glenfield, MA 01302
  (413) 774-3781

    1. Gary Lee, P.E., Mechanical Engineer
       Specialties include hydroelectric plant design, turbines, generators, and motors

    2. David Absher, P.E., Specialty Electrical Distribution Equipment

### Accounting:

- Katharyn Thompson, CPA/Partner
  RGL Forensic Accountants and Consultants
  1001 SW Fifth Ave., Suite 1554
  Portland, OR 97204

Additional consultants may be needed as the adjustment progresses. We have requested that the consultants provide preliminary budgets as to their anticipated expense.

MYI
00013

Interested Insurors & Underwriters
File No. 03.001284.MI-L
May 21, 2002
Page 14

## OTHER INSURANCE:

The Property and Boiler & Machinery insurors have been placed on notice. They have
initiated their investigation. We are obtaining copies of all policies so that a coverage
analysis can be accomplished. Potential contribution will be closely examined.

## CONTINUING INVESTIGATION:

Geological site testing is being scheduled by CH2M Hill. A protocol is being developed
by them and will be reviewed by our engineers in order to secure the information needed
by them to determine the cause(s) of the embankment failure.

Voluminous documents have been requested. The PUD has located this information and
is in the process of making copies for the interested parties. Our accountant has met with
the PUD controller and a meeting is being set up with the power schedulers. Considerable
information is needed regarding projected output, output share, revenue stream, operating
expenses, power purchase agreements with the Bonneville Power Administration, and
operation aspects of the PUD with regard to the Swift project.

## REMARKS:

Please accept this as our preliminary advice. Further reports to follow as information is
developed.

                    Very truly yours,

                    MAXSON YOUNG ASSOCIATES, INC.


                    Steven M. Larkin, CPCU, AIC
                    Vice President/Branch Manager

SML/js
Enclosures
03001284-rpt1

MYI
00014



1001 SW Fifth Avenue, Suite 1550
Portland, Oregon 97204

Telephone  503-224-6600
Facsimile   503-224-1963

rgl.com

# PROPERTY DAMAGE AND ECONOMIC LOSS REPORT

# FOR

# COWLITZ COUNTY PUBLIC UTILITY DISTRICT No. 1

### DATE OF LOSS
### April 21, 2002

### PREPARED BY
### RGL, INC.

### SUBMITTED TO
### Bruckmann & Victory, LLP

### November 17, 2004

RGL
11906

Atlanta, Charlotte, Chicago, Denver, Dublin, Indianapolis, Las Vegas, London, Los Angeles, New York, Orange County, Perth, Philadelphia, Portland, Sacramento, St Louis, Salt Lake City, San Diego, San Francisco, Seattle, Sydney, Tokyo.
RGL is a trade name of RGL, Inc.

CV04-5052RBL
Houser Dec., Exh. F-49

Cowlitz County Public Utility District No. 1
November 17, 2004



We have summarized the actual and anticipated total costs related to PUD's damages at Swift No. 2. The total actual and anticipated cost is based on our review of bids, contracts, financing agreements, invoices, change orders, purchase orders, receipts, timecards, employee expense vouchers and summary payroll rates. Below is a breakdown of PUD's damages:

| | |
|---|---:|
| • Physical Damage | $5,105,920 |
| • Supervisory Control and Data Acquisition | 899,284 |
| • Power Canal Repairs | 29,981,928 |
| • Equipment and Machinery | 17,154,772 |
| • Professional Fees and Expenses | 14,430,399 |
| • Legal and Regulatory Expenses | 2,601,749 |
| • Project Site Expenses | 46,862 |
| • Protection of Property | 1,026,484 |
| • Spillway Expenses | 609,557 |
| • Claim Presentation | 37,175 |
| • Contaminants/Environmental | 161,987 |
| • Contingency Fee | 4,000,000 |
| • Builder's Risk | 900,000 |
| • Financing | 759,000 |
| • Capitalized Interest | 2,643,000 |
| • Miscellaneous Expenses | 1,432,442 |
| • Business Income Loss | 26,239,060 |

| TOTAL | $108,029,619 |
|---|---:|

The $108,029,619 amount above is shown net of $908,673 that has been paid by PUD's liability carrier.

## BACKGROUND

Cowlitz County Public Utility District No. 1 (PUD) operates a hydroelectric power plant in Washington, known as Swift No. 2, which has been operating since 1959. On Sunday, April 21, 2002, Swift No. 2 was seriously damaged. This report addresses the damages incurred through September 30, 2004, along with the anticipated future costs.

## LOSS PERIOD

The loss period considered in our analysis began on April 21, 2002 and is still ongoing. Repairs are not complete and PUD continues to incur expenses related to this loss. As such, our report and schedules are subject to change as the loss period ensues and additional documentation becomes available.

As shown on Schedule 1, the **actual and anticipated damages** total $108,029,619, of which $63,936,230 relates to the following **bids**:

CV04-5052RBL
Houser Dec., Exh. F-50

RGL
11907

Cowlitz County Public Utility District No. 1
November 17, 2004



- VA Tech – Major Mechanical and Electrical          $16,642,417
- Kiewit Pacific Co. – 45-Foot Wide Power Canal      29,981,928
- Supervisory Control and Data Acquisition (SCADA)      899,284
- Washington Group International                     13,352,434
- Henkels & McCoy – Switchyard                        1,299,268
- Tapani Underground, Inc. – Tailrace Channel         1,760,899

| TOTAL BIDS | $63,936,230 |
|---|---|

As shown on Schedule 2, the reviewed **costs incurred through September 30, 2004** total $37,713,865 and consist of the following:

- Physical Damage (Powerhouse, Intake Structure, Tailrace & Switchyard)  $3,403,946
- Equipment and Machinery                            512,355
- Professional Fees and Expenses (Powercanal)      7,339,782
- Legal and Regulatory                              318,299
- Project Site Expenses                              46,862
- Protection of Property                          1,026,484
- Spillway Expenses                                 609,557
- Claim Presentation                                 37,175
- Contaminants / Environmental                      161,987
- Miscellaneous Expenses                          6,585,789
- Business Income                                17,671,629

| TOTAL COSTS INCURRED THRU 9/30/04 | $37,713,865 |
|---|---|

As shown on Schedule 1, the **other anticipated future costs** total $19,152,881 and consist of the following items:

- Legal and Regulatory                            $2,283,450
- Contingency Fee                                 4,000,000
- Builder's Risk                                    900,000
- Financing                                         759,000
- Capitalized Interest                            2,643,000
- Business Income                                 8,567,431

| TOTAL OTHER ANTICIPATED COSTS | $19,152,881 |
|---|---|

In our total loss amounts, we have omitted any overlap between the bids and actual costs incurred through September 30, 2004, totaling $12,773,357.

RGL
11908

CV04-5052RBL
Houser Dec., Exh. F-51

Cowlitz County Public Utility District No. 1
November 17, 2004



The total actual and anticipated loss can be summarized as follows:

- Total Bids                                          $63,936,230
- Actual Costs Incurred Thru 9/30/04                   37,713,865
- Other Anticipated Future Costs                       19,152,881
- Overlap Amounts Between Bid And Actual              (12,773,357)

| TOTAL DAMAGES | $108,029,619 |
|---|---|

## TOTAL ACTUAL AND ANTICIPATED DAMAGES

We categorized the actual and anticipated damages into the following cost categories based on discussions with PUD and our review of the supporting documentation. The actual amounts relate to items that have been supported by appropriate documentation such as invoices, contracts, purchase orders, receipts, timecards, employee expense vouchers and summary payroll rates. Schedules 3 through 12 detail the actual damages that have been reviewed through September 30, 2004. Liabilities for fish recovery costs have been excluded from our review. The future anticipated amounts have been derived from bids and the financing agreement and are shown on Schedules 22 and 23.

### PHYSICAL DAMAGE

The *physical damage claim pertains* to clean up and repair expenses to the Powerhouse, Intake Structure, Tailrace or Switchyard. As shown on Schedule 1, the actual and anticipated damages total $5,105,920, of which $3,403,946 has been incurred through September 30, 2004 and $1,701,974 relates to work to be completed on bids ($3,060,167 total bids less costs incurred through 9/30/04 of $1,358,193).

### SUPERVISORY CONTROL & DATA ACQUISITION

The *supervisory control & data acquisition* expenses relate to a bid in the amount of $899,284 for a new control system.

### POWER CANAL REPAIRS

The *power canal repairs* expenses relate to a bid in the amount of $29,981,928 for future repairs to the power canal.

### EQUIPMENT & MACHINERY

The *equipment and machinery expenses* pertain to costs to inspect and repair equipment. As shown on Schedule 1, the actual and anticipated damages total $17,154,772, of which $512,355 has been incurred through September 30, 2004 and $16,642,417 relates to work to be completed on bids.

CV04-5052RBL
Houser Dec., Exh. F-52

Cowlitz County Public Utility District No. 1
November 17, 2004



### PROFESSIONAL FEES & EXPENSES

The *professional fees and expenses* pertain to engineering, design, monitoring, assessment of damage, to the Powerhouse, Intake Structure, Tailrace, Power Canal and Other areas. As shown on Schedule 1, the actual and anticipated damages total $14,430,399, of which $7,339,782 has been incurred through September 30, 2004 and $7,090,617 relates to work to be completed on bids. The total actual and anticipated damages of $14,430,399 is shown net of the $10,010 that has been paid by PUD's liability carrier.

### LEGAL AND REGULATORY EXPENSES

The *legal and regulatory expenses* pertain to attorney's fees, board of consultant expenses and regulatory fees. As shown on Schedule 1, the actual and anticipated damages total $2,601,749, of which $318,299 relates to costs incurred through September 30, 2004 and $2,283,450 of anticipated future costs. The total actual and anticipated damages of $2,601,749 is shown net of the $52,060 that has been paid by PUD's liability carrier.

### PROJECT SITE EXPENSES

The *project site expenses* pertain to the costs to keep a temporary office on site. As shown on Schedule 1, the *project site expenses* total $46,862.

### PROTECTION OF PROPERTY

The *protection of property expenses* pertains to security and winterization expenses relating to the Powerhouse, Intake Structure, Tailrace and Power Canal. As shown on Schedule 1, the *protection of property expenses* total $1,026,484.

### SPILLWAY

The *spillway expenses* pertain to costs paid by PUD for emergency repairs, controlling erosion and building an earth filled dam. As shown on Schedule 1, the *spillway expenses* total $609,557.

### CLAIM PRESENTATION

The *claim presentation expenses* pertain to costs for document production. As shown on Schedule 1, the *claim presentation expenses* total $37,175. This amount is shown net of $30,219 that has been paid by PUD's liability carrier.

### CONTAMINANTS / ENVIRONMENTAL

The *contaminants / environmental expenses* pertain to those costs for soil sampling, disposal of debris relating to contamination and clean-up. As shown on Schedule 1, the

RGL
11910

CV04-5052RBL
Houser Dec., Exh. F-53

Cowlitz County Public Utility District No. 1
November 17, 2004



*contaminants / environmental expenses* total $161,987. This amount is shown net of $816,384 that has been paid by PUD's liability carrier.

**CONTINGENCY FEE**

As shown on Schedule 1, the *contingency fee* totals $4,000,000 and relates to future unforeseen costs.

**BUILDER'S RISK**

As shown on Schedule 1, the *builder's risk* totals $900,000 and relates to current and anticipated costs for insurance on the future repairs during the construction period.

**FINANCING**

As shown on Schedule 1, the *financing* totals $759,000 and relates to incurred costs for issuing the bonds.

**CAPITALIZED INTEREST**

As shown on Schedule 1, the *capitalized interest* totals $2,643,000 and relates to interest during the reconstruction period.

**MISCELLANEOUS EXPENSES**

The *miscellaneous expenses* pertain to costs that do not easily fit into one of the other categories. They include travel, meals, loan interest, advertisement, signs, and new submittal items that need to be reviewed and classified.  As shown on Schedule 1, the *miscellaneous expenses* total $1,432,442 ($6,585,789 is for costs incurred through September 30, 2004 less $5,153,347 that relate to bid expenses already incurred and expenses that have been reclassified).

**BUSINESS INCOME LOSS ON REPLACEMENT POWER**

As shown on Schedule 13, the replacement power purchases through September 30, 2004, total $14,610,555. While PUD sometimes purchased more power than was required to satisfy their contractual requirements (firm power) and to replace the lost power from Swift No. 2 needed to serve other system needs, they have only submitted the power amounts they would have received had the plant been in service. If these firm power purchases were not made to replace the lost power, then PUD would have been exposed to significant penalties under the terms of its wholesale power purchase agreement with the Bonneville Power Administration.

Estimated future replacement power purchases for October 2004 through November 2005 total $7,470,406 and were computed on Schedule 25.  The estimated monthly power purchases were based on the power purchased for the same month in the previous year.

RGL
11911

**CV04-5052RBL**
**Houser Dec., Exh. F-54**

Cowlitz County Public Utility District No. 1
November 17, 2004



We intend on updating the estimated expenses as the loss period ensues and actual results become available.

## BUSINESS INCOME LOSS ON NON-FIRM POWER PRODUCTION

As shown on Schedule 14, the business income loss pertains to the non-firm power that PUD would have provided to the Bonneville Power Administration (above the firm power contracted amount) in exchange for revenue credits totaling $3,061,074.

Monthly business income losses were calculated separately for April 21, 2002, through September 30, 2004, on Schedules 18A through 18AD. The losses were calculated using both the gross earnings and business income approaches. The business income approach calculates the loss by adding continuing normal operating expenses to the net profit that would have been earned or incurred. The resulting amount is then reduced by the gross profit earned on actual sales. We have included the gross earnings approach of lost sales less non-continuing expenses for additional information.

Estimated future monthly business income losses for October 2004 through November 2005 total $1,097,025 and were computed on Schedules 25 through 31. We intend on revising the estimated amounts as the loss period ensues and actual information becomes available.

We reviewed income statements for the fiscal year ended December 31, 2001. The projection of monthly net profits, continuing normal operating expenses, and non-continuing expenses was based on our analysis of information from the year-end December 31, 2001 detailed income statement, as shown on Schedule 20. Specific items were identified as fixed or variable based on our review of the detailed income statements and discussions with PUD. We have continued to review interim financial statements to verify that the non-continuing expenses are accurate.

As shown on Schedules 19A, 19B, and 19C lost revenues for 2002, 2003, and 2004, respectively, were based on the difference between the firm energy declarations required per the Bonneville Power Administration (BPA) Contract and the Swift Shadow Generation. This difference, if any, represents the non-firm power that PUD would have provided to the BPA in exchange for a billing credit.

PUD has a wholesale power purchase contract with the BPA, which in part requires PUD to provide specific peak megawatts (MW) on a daily basis and specific megawatt-hours (MWh) of energy on a monthly basis. After the loss, PUD negotiated new daily peak and monthly energy requirements with BPA, which set the daily peak requirement equal to the monthly average energy requirement. The negotiated power requirements converted the BPA contractual requirements, which were in the form of a peaking resource, to flat blocks of power, which are a standard market commodity. This allowed PUD to readily purchase standard flat blocks of replacement power from the market at reduced rates. These negotiated power requirements decreased the daily peak MW requirements while slightly increasing the monthly MWh requirements. The net result was a significant mitigation of PUD's loss.

Page 7

Cowlitz County Public Utility District No. 1
November 17, 2004



PUD's contract requires them to provide specific power each day and if they fall short on the daily power requirements, they must purchase power from the spot market in order to meet their contract obligations and avoid severe penalties. PUD computed the MWh's that they would have received had the loss not happened. In making these computations, PUD relied on the "paper pond" calculations, which are based on the resource conversion tables designed by Bechtel Engineers and others in the 1950's.

We reviewed historical "paper pond" production data in an effort to confirm the reasonableness of the projected power. The data provided demonstrated the reliability of projected power using the daily "paper pond" computations. PUD reconciles its anticipated power production using the "paper pond" calculation to PacifiCorp's records on a daily basis. Any difference is immediately resolved.

Because PacifiCorp continued to operate Swift No. 1 immediately upstream from Swift No. 2, the daily water inflows were available from PacifiCorp. This removed the guesswork that could have been incurred during the loss period relating to anticipated production based on average rainfalls, etc.

## SUMMARY

As shown on Schedule 1, the total actual and anticipated loss is $108,029,619. The total actual and anticipated damages are based on our review of bids, contracts, financing agreements, invoices, change orders, purchase orders, receipts, timecards, employee expense vouchers, summary payroll rates, and the financing agreement. The total actual and anticipated amount of $108,029,619 is shown net of the $908,673 that has been paid by PUD's liability carrier.

RGL, Inc.

*Katharyn Thompson*

By Katharyn Thompson, CPA
kthompson@us.rgl.com

Enclosures

RGL
11913

CV04-5052RBL
Houser Dec., Exh. F-56